IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 15, 2020

## STATE OF TENNESSEE v. MARLON WILLIAM COTHAM

**Appeal from the Circuit Court for Robertson County**
**No. 74CC4-2018-CR-274  Jill Bartee Ayers, Judge**

_____

### No. M2019-00929-CCA-R3-CD

_____

The Defendant, Marlon William Cotham, was convicted of aggravated robbery, a Class B felony, and sentenced to nine years in the Department of Correction.  On appeal, he argues that the evidence is insufficient to sustain his conviction, and the trial court erred in imposing a sentence of nine years.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Gregory D. Smith, Springfield, Tennessee, for the appellant, Marlon William Cotham.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and James Winn Milam, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The Defendant and a second, unknown, individual were indicted for aggravated robbery as a result of their stealing the victim, Demarco Campbell's, camcorder at gunpoint when they met to supposedly purchase the camcorder after seeing it listed for sell on a resale website.

### State's Proof

At trial, the victim testified that he lived in Clarksville but worked as a video editor in Nashville.  In October 2017, he owned a Canon XA25 professional video camcorder that

he wanted to sell in order to upgrade to a better device.  He listed the camcorder on a website known as "Let's Go," along with a wireless microphone, lenses, batteries, and cleaning tools.  A potential buyer with the profile name of Matt Smith responded to the listing, and they agreed on a price and arranged to meet at a gas station halfway between Clarksville and Nashville.

On October 28, 2017, the victim went to the designated meeting spot and, after a few minutes, a black Nissan Altima pulled up beside him.  The driver was a "heavy set medium built, brown skinned, African American," whom the victim identified in court as the Defendant.  The victim and the Defendant got out of their respective cars and shook hands.  The victim opened his trunk and showed the camcorder to the Defendant.  He explained how the camcorder worked and reviewed its features, but the Defendant did not ask any questions.  According to the victim, the Defendant did not appear to know very much about video equipment or give any indication as to why he wanted to buy it.

After talking for a few minutes, the victim noticed there was a passenger sitting in the black Altima.  The victim let the Defendant hold the camcorder, and the Defendant said that he would be right back.  The victim began to follow the Defendant, and the passenger got out of the car with two guns drawn.  The passenger pointed the guns at the victim and told him to walk away.  The victim backed up and then turned and ran.  He ran around the gas station building and back to the front.  When he got back, the Altima was getting on the highway.  The victim got into his car and followed the Altima onto the interstate towards Nashville, while calling 911 from his cell phone.  The dispatcher told him to stop following the Altima and get off the interstate at the next exit and wait for the police.

On cross-examination, the victim acknowledged that he did not know which of the two individuals in the black Altima had texted him about the camcorder and meeting up. The victim said that he did not see either individual take the camcorder accessories out of his trunk because he ran away, but he discovered that the items were missing later.

Deputy Mark Strobel with the Robertson County Sheriff's Office responded to the victim's location, and the victim directed him to a gas station on Maxey Road where the incident took place.  Deputy Strobel noted that the gas station had a surveillance camera outside that recorded the incident.

Special Agent Randy Haley with the Tennessee Department of Revenue, Anti-Theft Division, testified that motor vehicle records showed that a black Nissan Altima was registered to the Defendant and his father at an address in Nashville.

Deloree Skerit, the manager at a Cash America pawn shop in Nashville, produced a purchase ticket that showed that the Defendant sold a Canon XA25 camcorder on October

28, 2017, for $800. Ms. Skerit gave the police surveillance footage that recorded the transaction.

Corporal Justin Morris with the Robertson County Sheriff's Office responded to the scene of the aggravated robbery. He was aware that the incident was captured on the gas station's surveillance system but was not involved in reviewing the footage.

Detective Brett Keck with the Robertson County Sheriff's Office was the lead investigator in the case. During his testimony, the surveillance video from the gas station was played for the jury. Detective Keck identified the Defendant in the video and stated that the video was consistent with the victim's account of the robbery. The video showed the passenger take the camera bag and accessories from the trunk after the victim ran off. Detective Keck said that the victim provided him with a list of everything taken during the robbery. Detective Keck reviewed the surveillance video obtained from the pawn shop. He noted that the video showed the Defendant, alone, selling the camcorder and accessories about two and half to three hours after the robbery. He observed that the Defendant appeared nervous or slightly agitated. The surveillance video from the pawn shop was also played for the jury. On cross-examination, Detective Keck acknowledged that the Defendant voluntarily turned himself in to the police.

**Defendant's Proof**

Doretha Cotham, the Defendant's mother, testified that the Defendant was a Communications major in college and, therefore, "knew a lot about video cameras." She recalled that he owned two video cameras and hoped to open a videography business. Mrs. Cotham said that she never had any trouble with the Defendant and that he always tried to help people. She said that the Defendant had never previously been accused of robbing somebody.

On cross-examination, Mrs. Cotham acknowledged that on the day of the incident, she did not get any phone calls or text messages from the Defendant saying that he was being forced to do something against his will. She said that at the time of the incident, the Defendant was working part-time at Target.

The Defendant testified that earlier on the day of the incident, he visited a camera store to look at equipment because he was "a video editor and photographer." After leaving the camera store, the Defendant stopped at a gas station where he was approached by a barely known acquaintance named John. John offered the Defendant $20 gas money in exchange for giving him a ride to buy some video camera equipment "about twenty minutes up the road" towards Clarksville. The Defendant said that John was texting the person

- 3 -

selling the equipment during the trip. John directed him to get off on the Maxey Road exit and pull into a gas station. John continued to text as they arrived at the gas station.

The Defendant acknowledged that he was the driver of the car in the surveillance video shown to the jury. However, he said that John was the potential buyer of the video equipment and that he was just seeing if the camcorder was in good working order for John. The Defendant recalled that he told the victim that he would be right back, intending to inform John of the camcorder's condition, when John suddenly jumped out of the car with two guns. John yelled at the victim to run and told the Defendant to get in the car. John took the camcorder equipment from the victim's trunk, got into the Defendant's car, and pointed a gun at the Defendant and told him to drive.

The victim said that he drove around for a period of time at John's direction, all the while John had a gun pointed at him. The Defendant was afraid that John would shoot him because he "was the only witness." The Defendant stated that he went into the pawn shop at John's direction because John told him in a threatening manner that he knew the Defendant's name and address. The Defendant acknowledged that he sold the camcorder and equipment but said that he did not do so voluntarily. He admitted that he was very nervous inside the pawn shop and kept looking around to see if John was coming inside. After receiving the money from the pawn shop, the Defendant returned to his car and gave the money to John.

The Defendant said that John told him to drive at gunpoint again, and they eventually returned to the vicinity where John had initially requested a ride. John got out of the car, and the Defendant sped away. The Defendant heard gun shots while he was driving away, and he later checked his car and found a bullet hole in the trunk.

The Defendant said that he did not call the police because he knew John had his name and address and was scared that he might seek retribution. Likewise, he did not tell his parents about what had happened because he did not want them to worry. The Defendant claimed that he did not intend to be involved in a robbery and did not willingly take the items to the pawn shop. He said he "was doing exactly what I was told to do."

On cross-examination, the Defendant acknowledged that other than basic information, he could not offer much detail about what John looked like even though they were together for almost three hours.

Following the conclusion of the proof, the jury convicted the Defendant, as charged, of aggravated robbery.

**ANALYSIS**

- 4 -

## I. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his conviction, asserting that he acted under duress.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code

Ann. §§ 39-13-401(a), -402. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2).

In the light most favorable to the State, the evidence shows that the Defendant was familiar with cameras and video equipment due to his college education and career goals. After engaging in a discussion with the victim about buying a camcorder and accessories he listed for sale, the Defendant and an unidentified passenger met the victim at a gas station. The Defendant looked over the camera, presumably checking its condition, and then the unidentified passenger jumped out of the car aiming two handguns at the victim. Surveillance footage from the gas station supported the victim's account of the incident. Hours later, the Defendant sold the camcorder and accessories to a pawn shop. Based on this evidence, there was sufficient evidence for a rational trier of fact to find that the Defendant was at least criminally responsible for the aggravated robbery of the victim.

In considering the Defendant's assertion of duress as a defense to his conviction, we apply the following statute:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Id. § 39-11-504. If admissible evidence supporting a duress defense is introduced, the State must negate the defense beyond a reasonable doubt before the defendant may be convicted. Id. § 39-11-201(a)(3).

The jury received an instruction on duress in light of the Defendant's claim that his actions were compelled by the unidentified passenger's pointing a gun at him. However, the jury heard the Defendant's dubious account of how he picked up an acquaintance at a gas station who happened to be en route to purchase video equipment, something that he

personally was interested in, and also how he never attempted to inform anyone in the pawn shop that he was being threatened while away from the other individual for almost thirty minutes. The jury was well within its prerogative in finding the Defendant not credible and rejecting his claim that he acted under duress.

## II. Sentencing

The Defendant also challenges the trial court's imposition of a nine-year sentence.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a

presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id.

At the sentencing hearing, the Defendant's mother and father both testified on his behalf, and the Defendant, personally, apologized "for the whole situation" while claiming ignorance for his role in the crime. The State entered the presentence report into evidence, and presented proof of two Class B misdemeanor convictions that were not identified in the report.

In imposing a term of nine years, the trial court found that the Defendant had failed to comply with the conditions of a sentence involving release in the community, and had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(8) and (10). The court applied the catchall mitigating factor because the Defendant's criminal record consisted of only three misdemeanors. See id. § 40-35-113(13).

The Defendant asserts that the trial court erroneously enhanced his sentence upon a finding that he committed the crime when the risk to human life was high because there was no proof that anyone "besides [the victim] was put in active danger." He proposes that the one remaining enhancement factor and one mitigating factor "cancel each other out and an eight (8) year sentence is appropriate."

In finding that the Defendant had no hesitation about committing a crime when the risk to human life was high, the trial court explained that there was high risk "to all the other folks that were around at that market as we watched that video. There were other people coming and going." The surveillance video supports the trial court's finding that there were bystanders at the gas station around the time of the aggravated robbery.

In any event, even if the trial court erred in its consideration of the enhancement factor, the defendant is not entitled to relief because "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the [sentencing act]." Bise, 380 S.W.3d at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. The trial court was not required to impose the minimum sentence, and there is support in the record for the sentence imposed. The trial court did not abuse its discretion.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE